IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

CHRISTOPHER BURNS

No. 3:14-cv-00789-HZ

Plaintiff,

OPINION & ORDER

v.

COMMISSIONER SOCIAL SECURITY
ADMINISTRATION

Defendant.

Tim Wilborn
Wilborn Law Office, P.C.
P.O. Box 370578
Las Vegas, NV 89137

      Attorney for Plaintiff

//
//
//

1 - OPINION & ORDER

Billy J. Williams
Acting United States Attorney, District of Oregon
Ronald K. Silver
Assistant United States Attorney
1000 S.W. Third Avenue, Suite 600
Portland, OR 97201

L. Jamala Edwards
Special Assistant United States Attorney
Social Security Administration
SSA Office of General Counsel
701 5th Avenue, Suite 2900 M/S 221A
Seattle, WA 98104

      Attorneys for Defendant

HERNÁNDEZ, District Judge:

      Plaintiff Christopher Andre Burns brings this action under the Social Security Act ("Act"), 42 U.S.C. § 405(g), for judicial review of the Commissioner of Social Security's final decision denying his claim for Disability Insurance Benefits ("DIB") under Title II of the Act. Because it is based on legally sufficient reasons supported by substantial evidence, the Commissioner's decision is affirmed.

## BACKGROUND

      Burns's medical problems started in earnest after he was assaulted with a tree branch in 2007 and suffered a traumatic brain injury. Tr. 253. After recovering from emergency surgery in the hospital, he moved in with his mother. Tr. 28. He experienced cognitive impairment, confusion, and short term memory issues. Tr. 240–41. His primary problem, however, was constant, throbbing headaches. Tr. 239–41. Over the years, he has visited multiple doctors and pain specialists to treat the headaches, with little success finding lasting relief. Tr. 412–31, 446, 527, 529–36, 1021–42.

2 - OPINION & ORDER

Burns applied for Supplemental Security Income ("SSI") and DIB on April 5, 2007. Tr. 149, 154. The Commissioner denied both applications, and Burns requested a hearing before an Administrative Law Judge ("ALJ"). Tr. 65. After a hearing in March of 2010, ALJ Deborah Van Vleck found Burns was not disabled. Tr. 5–18. Burns appealed, but the Appeals Council denied his request for review. Tr. 1–3. Burns then filed a civil action in this court in 2011, and after the parties stipulated that the case should be remanded for further administrative proceedings, Magistrate Judge John Jelderks issued an order to that effect in February of 2012. Tr. 717–21. On remand, ALJ Riley Atkins held a new hearing on July 1, 2013, and ruled on July 10, 2013, that Burns was disabled as of January 1, 2011. Tr. 565, 584. Burns was, therefore, entitled to SSI benefits, but since his date of last insured for DIB benefits was March 31, 2009, he was not entitled to disability benefits. Tr. 584. Burns again appealed the ALJ's decision to the Appeals Council, which denied his request for review, making ALJ Atkins's ruling the Commissioner's final decision that Burns now challenges in this Court.

## SEQUENTIAL DISABILITY EVALUATION

A claimant is disabled if he is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Disability claims are evaluated according to a five-step procedure. See Valentine v. Comm'r Soc. Sec. Admin., 574 F.3d 685, 689 (9th Cir. 2009). Each step is potentially dispositive. At step one, the presiding ALJ determines whether the claimant is engaged in "substantial gainful activity." If so, the claimant is not disabled; if not, the analysis continues. 20 C.F.R. §§ 404.1520(b), 416.920(b). At step two, the ALJ determines whether the claimant has one or more severe impairments. If not, the claimant is not disabled. 20 C.F.R. §§ 404.1520(c),

3 - OPINION & ORDER

416.920(c). At step three, the ALJ determines whether the impairment meets or equals one of the impairments listed in the SSA regulations and deemed "so severe as to preclude substantial gainful activity." Bowen v. Yuckert, 482 U.S. 137, 141 (1987); 20 C.F.R. §§ 404.1520(d), 416.920(d). If so, the claimant is conclusively presumed disabled; if not, the analysis moves to step four. 20 C.F.R. §§ 404.1520(d), 416.920(d). At step four, the ALJ determines whether the claimant, despite any impairments, has the residual functional capacity ("RFC") to perform past relevant work. 20 C.F.R. §§ 404.1520(e), 416.920(e). If the claimant cannot perform his or her past relevant work, the analysis moves to step five, where the ALJ determines whether the claimant is able to do any other work in the national economy considering the claimant's RFC, age, education, and work experience. 20 C.F.R. §§ 404.1520(g), 416.920(g).

The burden to show disability rests with the claimant at steps one through four, but if the analysis reaches step five, the burden shifts to the Commissioner to show that a significant number of jobs exist in the national economy that the claimant could perform. 20 C.F.R. §§ 404.1520(e) & (f), 416.920(e) & (f); Tackett v. Apfel, 180 F.3d 1094, 1098–1100 (9th Cir. 1999). If the Commissioner demonstrates a significant number of jobs exist in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g)(1), 416.920(g).

## ALJ DECISION

Before proceeding through the five-step evaluation, ALJ Atkins found that Burns had "acquired sufficient quarters of coverage to remain insured through March 31, 2009," meaning Burns had to establish disability on or before that date to be entitled to disability insurance benefits. Tr. 569–70. At step one, the ALJ found that Burns had not engaged in substantial gainful activity since 2006. Tr. 572. At step two, the ALJ found that Burns had the "following

severe impairments: residual effects of traumatic brain injury, with temporal bone fracture and chronic residual headaches; degenerative disc disease of the cervical spine; and alcohol abuse disorder." Tr. 572. At step three, the ALJ found Burns's impairments did not meet or equal the requirements of a listed impairment under 20 C.F.R. Part 404, Subpart P, Appendix 1. Tr. 572. Next, the ALJ found that, from February 19, 2007, through December 31, 2010, Burns had the following RFC:

> [C]laimant had the residual functional capacity to perform light work as defined in 20 CFR 404.7567(b) and 416.967(b) except: lift twenty pounds occasionally and ten pounds frequently; stand and walk six hours total of an eight-hour day; no sitting limitations; occasionally climb ramps and stairs, but no other climbing; avoid concentrated exposure to hazards such as heights and dangerous machinery; occasionally crawl and crouch; remember and carry out simple, one to two step demands, but would have difficulty with more detailed tasks; might have difficulty maintaining concentration for extended periods, but able to sustain over an eight-hour workday if given breaks every couple hours; occasional public contact; and routine, casual interactions with co-workers and supervisors.

Tr. 575. At step four, the ALJ found that Burns could not perform any past relevant work since February 19, 2007, the date Burns suffered his traumatic brain injury. Tr. 576, 580. Prior to January 1, 2011, the ALJ found that Burns could work as a room cleaner, laundry worker, and small products assembler. Tr. 581. After January 1, 2011, however, the ALJ found that Burns had greater limitations. Tr. 582. The ALJ's new RFC included the same pre-2011 limitations and a new limitation that Burns "would on an occasional basis suffer marked deficits in concentration and attention." Tr. 582. The eroding of Burns's skills led the ALJ to find him disabled as of January 1, 2011, and Burns was thus entitled to SSI benefits beginning on that date. Tr. 584. Burns was not entitled, however, to disability benefits because he was not disabled between his filing date of March 20, 2007, and March 31, 2009, the date he was last insured.  Tr. 584.

## STANDARD OF REVIEW

The district court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record as a whole. 42 U.S.C. § 405(g); see also Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995). "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Id. The court must weigh all of the evidence, whether it supports or detracts from the Commissioner's decision. Martinez v. Heckler, 807 F.2d 771, 772 (9th Cir. 1986). If the evidence is susceptible to more than one reasonable interpretation, the court must uphold the decision. Andrews, 53 F.3d at 1039–40. A reviewing court must consider the entire record as a whole and cannot affirm the Commissioner by simply isolating a specific quantum of supporting evidence. Robbins v. Soc. Sec. Admin., 466 F.3d 880, 882 (9th Cir. 2006) (citation omitted).

## DISCUSSION

Burns contends the ALJ erred by 1) improperly rejecting the opinion of Dr. Kimberly Goslin, Burns's treating neurologist, 2) improperly rejecting Burns's testimony about his symptoms, 3) improperly rejecting lay witness statements, 4) failing to support with substantial evidence his pre-2011 step five finding that Burns could perform certain occupations, and 5) failing to support with substantial evidence the conclusion that Burns became disabled after January 1, 2011.

### 1.  Dr. Goslin's Opinions

Burns first argues that the ALJ erred by improperly discounting several opinions from Dr. Goslin in which she stated Burns suffered from a "severe, debilitating headache disorder" and cognitive impairment caused by the traumatic head injury he suffered in 2007, and as a result he

was unable to sustain any work.  Tr. 1063–69.  The ALJ gave "little weight" to Dr. Goslin's

2009 and 2011 opinions based on their inconsistencies with objective testing performed by

consulting psychologists Drs. Donna Wicher and Marc Stuckey, consulting neurologist Dr.

Tatsuro Ogisu, and the opinion of non-examining psychiatrist Dr. Robert McDevitt. Tr. 577–78.

There are three sources of medical opinion evidence in Social Security cases: treating

physicians, examining physicians, and non-examining physicians. Valentine, 574 F.3d at 692

(citing Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1995)). The ALJ can reject the

uncontroverted opinion of a treating or examining physician only for "clear and convincing

reasons" supported with substantial evidence in the record. Orn v. Astrue, 495 F.3d 625, 632 (9th

Cir. 2007) (quoting Reddick v. Chater, 157 F.3d 715, 725 (9th Cir. 1998)). Even if a treating or

examining doctor's opinion is contradicted by another doctor, the ALJ can reject it only by

providing "specific and legitimate reasons" that are supported by substantial evidence. Id.

Dr. Wicher performed a consulting psychological examination of Burns in August of

2007. Tr. 577, 924–30. Dr. Wicher diagnosed cognitive disorder, dysthymic disorder, and

alcohol abuse in remission. Tr. 929. Burns scored a borderline 78 on an IQ test, but scored at or

above that level on memory tests, and significantly higher on the "Trail Making test." Tr. 927–

29. Dr. Wicher noted several times that it appeared Burns may have been giving less than full

effort. Tr. 929–30. Dr. Wicher listed "moderate deficits in his ability to perform activities of

daily living, mild deficits in social functioning, and moderate limitations in concentration,

persistence, and pace." Tr. 930.

Dr. Stuckey performed a similar exam in April of 2008. Burns reported "routine contact

with friends," using public transportation, test driving a car, building models, playing video

games, and watching "quite a bit" of television.  Tr. 377, 381. Dr. Stuckey noted that Burns

scored below average on some memory tests, but all of his other scores were in the average range. Tr. 381. Burns told Dr. Stuckey that he had regular headaches that ranged from a five to six on most days and increased with physical activity such as "bending over." Tr. 379. Dr. Stuckey noted that Burns seemed to exaggerate or misreport his symptoms: "[Mr. Burns's] current presentation . . . appeared less severe that his stated self report." Tr. 381. Dr. Stuckey also wrote that Burns "appeared to endorse symptomatology automatically when asked without providing sufficient examples[.]" Tr. 379.

Dr. Ogisu conducted a consulting neurological examination in September of 2007. Tr. 332. Burns reported his headache problems, and said he was treating them with Tylenol. Tr. 332–33. Dr. Ogisu noted that Burns moved without difficulty, that his range of motion was good, and that there was no sign of fatigue during the exam. Tr. 333–34. Burns had some difficulty completing some arithmetic tasks, but Dr. Ogisu observed that he was "attentive," "follow[ed] simple commands well," appeared to have appropriate judgment, and was not "disinhibited, irritable, or labile." Tr. 333. "Except for mild cognitive deficits," Dr. Ogisu explained, Burns's "neurologic exam [did] not reveal significant abnormalities." Tr. 334. Dr. Ogisu concluded that Burns was limited to lifting thirty-five pounds occasionally and twenty pounds frequently, and that he could stand and walk a total of six hours in an eight-hour day. Tr. 335.

The ALJ also relied on testimony from Dr. Robert McDevitt, a non-examining medical expert with a specialty in traumatic brain injury and cognitive therapy. Tr. 618, 800. Dr. McDevitt stated that Burns did have some brain damage, but did not have any evidence of serious damage in the form of frontal lobe release phenomenon, which is when a patient exhibits primitive reflexes in response to certain stimuli. Tr. 623–24. Dr. McDevitt opined that Burns's chronic headache pain was a result of inactivity and Burns's sedentary lifestyle. Tr. 624. The

"most important" part of rehabilitation from traumatic brain injury, Dr. McDevitt explained, is "early rehabilitation and return to some kind of productive activity." Tr. 620. But Burns "wasn't doing very much before he got injured," and was doing "much less since his injury." Tr. 620. He explained that head pain can often be the result of preoccupation: if all Burns does is "lay around," with nothing else to do other than think about his injury, his scar, and the pain, he can actually make his pain worse. Tr. 624. McDevitt stated that individuals with chronic head pain can often benefit from increased activity. Tr. 631. Although the activity might cause physical pain at first, the increased movement can benefit the pain symptoms long term because it lessens the patient's preoccupation. Tr. 631. Dr. McDevitt noted that Burns's symptoms showed "considerable improvement" after a few visits with a physical therapist in 2010. Tr. 622.

He also stated that there were "credibility issues" with Burns's reported headache pain "all over his head." Tr. 622. Most diagnosed headaches such as migraines or tension headaches, he explained, have "clear symptoms" and "signature pain." Tr. 629. "All over" headache pain, however, is often a "somatic expression" of mental health issues such as depression or anxiety. Chronic pain from a traumatic brain injury "usually last[s] six months to a year after [the injury], and after the first year if they still have chronic pain, then it's often felt to be due to depression or other issues that need to be addressed by a mental health person." Tr. 622.

The ALJ gave Dr. McDevitt's testimony "significant weight," because it was "based on a complete review of the evidence, and it is a detailed explanation of apparent inconsistencies in the record." Tr. 574. The ALJ further reasoned that "Dr. McDevitt is the only medical professional who has reviewed all of the evidence and testimony and testified to experience with traumatic brain injury patients." Tr. 574.

Finally, the ALJ gave little weight to Dr. Goslin's 2013 opinion, in which her answers to a questionnaire indicated that Burns was incapable of sustaining any work. Tr. 1067. The ALJ explained that there were no treatment records from Dr. Goslin after 2010, and that the other medical evidence in the record did not support Dr. Goslin's severe restrictions on Burns's ability to lift, stand, walk, or sit. Tr. 583.

In sum, the medical evidence in the record about the severity of Burns's symptoms was conflicting and ambiguous. The ALJ discounted Dr. Goslin's opinions that Burns's debilitating headaches prevented him from performing any work because those opinions conflicted with other medical evidence in the record that suggested otherwise. Tr. 578.The ALJ explained how testing from consulting doctors before 2011 showed Burns's symptoms were less severe than he reported, and those doctors concluded that Burns was only mildly limited in his functioning. Tr. 577.  The ALJ noted medical evidence that showed Burns's headaches significantly improved when he underwent therapy in 2010, which conflicts with Dr. Goslin's opinion that Burns's headaches required him to "spend most of the day in bed" and essentially prevented him from engaging in even sedentary work. Tr. 578, 1063–69.

An ALJ faced with conflicting medical evidence can meet his burden to provide "specific and legitimate" reasons for rejecting a treating physician's opinion by "setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating [his] interpretation thereof, and making findings." Tommasetti v. Astrue, 533 F.3d 1035, 1041 (9th Cir. 2008) (quoting Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir. 1989)). The ALJ in this case met that standard, and the Court defers to his interpretation of evidence because the ALJ is the "final arbiter with respect to resolving ambiguities in the medical evidence." Id.

## 2. Burns's Testimony

In formulating Burns's RFC, the ALJ discounted his testimony about the intensity, persistence, and limiting effects of his symptoms as "not entirely credible." Tr. 576. Burns argues that the ALJ erred because he did not give clear and convincing reasons to support his adverse credibility finding.

In determining a claimant's RFC, the ALJ must consider all relevant evidence in the record, including medical records, lay testimony, and the "effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment." Robbins, 466 F.3d at 883 (quoting SSR 96–8p, 1996 WL 374184, at *5); see also 20 C.F.R. §§ 404.1529(a), 404.1545(a), 416.929(a), 416.945(a) (explaining that, in determining whether a claimant is disabled, the Social Security Administration considers "all . . . symptoms, including pain, and the extent to which [those] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence.")

An ALJ analyzes the credibility of a claimant's testimony regarding his subjective pain and other symptoms in two steps. Lingenfelter v. Astrue, 504 F.3d 1028, 1035–36 (9th Cir. 2007). "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged." Id. at 1036 (citation and internal quotation omitted). "The claimant, however, need not show that [his] impairment could reasonably be expected to cause the severity of the symptom [he] has alleged; [he] need only show that it could reasonably have caused some degree of the symptom." Id. (citation and internal quotation omitted). If the claimant meets the first test, and there is no evidence of malingering, the ALJ can reject his testimony about the

severity of his symptoms only by offering specific, clear and convincing reasons for doing so. Id. (citation and internal quotation omitted).

In evaluating a claimant's testimony, the ALJ may rely on "ordinary techniques of credibility evaluation." Molina v. Astrue, 674 F.3d 1104, 1112 (citation omitted). "For instance, the ALJ may consider inconsistencies either in the claimant's testimony or between the testimony and the claimant's conduct, unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment, and whether the claimant engages in daily activities inconsistent with the alleged symptoms." Id. (internal citations and quotation marks omitted).

At step one, the ALJ found that Burns's medically determinable impairments could reasonably be expected to cause some of his alleged symptoms. Tr. 576. At the hearing, Burns testified about his headaches and their limiting effects on his daily life and ability to work. He stated that his headaches severely limit his sleep to only two hours a night. Tr. 575.  He claimed to be able to sit for about twenty to thirty minutes at a time before having to get up and walk, and he was only able to walk a short time before feeling dizzy. Tr. 575. Burns testified that "the pounding never stops but the severity of it is depending on how long I do something." Tr. 612. He said that he could lift only about ten pounds, and only occasionally. Tr. 575, 613. He admitted to performing some small chores, including folding laundry, doing the dishes, and mowing the small lawn at the mobile home park where he lives, but he also testified that these activities caused his headaches to increase. Tr. 611–14.

The ALJ provided several reasons for discounting Burns's testimony, any one of which is sufficient to uphold the conclusion that Burns was less than credible. See Carmickle v. Comm'r, Soc. Sec. Admin., 533 F.3d 1155, 1162 (9th Cir. 2008) (explaining that an error in one reason for

discounting credibility is harmless where an ALJ's "remaining reasoning and ultimate credibility determination were adequately supported by substantial evidence in the record.")

The ALJ referenced two instances where Burns's physicians suggested that he might be malingering. The ALJ wrote that Dr. Wicher noted that during her psychological evaluation of Burns in August of 2007, it appeared that he "may have given less than full effort." Tr. 577. The ALJ also noted that the Dr. Stuckey's psychological evaluation report from April of 2008 stated that Dr. Stuckey believed Burns's "symptoms were less severe than the claimant reported." Tr. 577. The ALJ concluded that this "finding of poor effort also suggests [Burns] had fewer limitations than alleged." Tr. 577. The ALJ's reliance on the opinions of two consulting physicians that Burns might have exaggerated symptoms is a sufficient reason for discounting his testimony. Batson v. Comm'r of Soc. Sec. Admin., 359 F.3d 1190, 1196 (9th Cir. 2004) (explaining that ALJ's reliance on a physician's stated skepticism about the claimant's "graphic and expansive" pain symptoms was a specific and legitimate reason to discount claimant's pain testimony).

The ALJ also discounted Burns's testimony about his debilitating pain because "medical records show minimal treatment following [Burns's] hospital stay. Between 2007 and 2009, most of the record involved a series of consulting physical and psychological examinations." Tr. 576. After his discharge from the hospital following his assault, Burns visited his doctors about every two weeks through May of 2007. Tr. 240, 316–320. In June of 2007, he still reported headache pain, but he visited his doctor only once a month, despite reporting headaches that were a constant "6-7 [with] 10 being the worst." Tr. 315, Tr. 472–77. Some were so painful, he claimed, he was forced to sit in a dark room. Tr. 477. Burns still reported "constant and throbbing" headaches in April of 2008, but it had been three months since he had visited a doctor. Tr. 469–

70. Another three months later, Burns reported "severe" headaches that were increasing in

severity. Tr. 468. He did not see another doctor about his headaches until he started treatment at

the Virginia Garcia Medical Center in December of 2008. Tr. 432. The ALJ properly relied on

the discrepancy between Burns's alleged debilitating headache pain and significant gaps in

seeking treatment. Molina, 674 F.3d at 1114–15 (explaining that the Ninth Circuit has "long held

that, in assessing a claimant's credibility, the ALJ may properly rely on unexplained or

inadequately explained failure to seek treatment or to follow a prescribed course of treatment.")

(citation and internal quotation omitted).

The ALJ also discredited Burns's testimony because his "daily activities show fewer

limitations than alleged." Tr. 576. The ALJ explained that Burns "used a computer for a job

search . . . test drove a car . . . could vacuum, watch television, play video games, build models,

and microwave food." Tr. 576. The ALJ also stated that Burns could "do the dishes, do the

laundry, and mow the lawn, though he does these activities quickly (before the headache pain

increases)." And finally, the ALJ noted that Burns testified that he could "cook, clean, and

maintain hygiene." Tr. 576.

Engaging in daily activities that are inconsistent with the severity of symptoms can

support an adverse credibility finding. Winn v. Colvin, No. 6:14-CV-00564-HZ, 2015 WL

1809012, at *5 (D. Or. Apr. 21, 2015) (citing Ghanim v. Colvin, 763 F.3d 1154, 1165 (9th Cir.

2014)). Burns's stated daily activities are not necessarily inconsistent with his pain allegations.

However, because the ALJ gave other legitimate and legally sufficient reasons for discounting

Burns's testimony, any legal error the ALJ committed in analyzing Burns's daily activities is

harmless. Carmickle, 533 F.3d at 1162.

### 3.  Lay Witness Testimony

Burns also contends that the ALJ failed to give a germane reason to reject the lay testimony of his mother, Ms. Sutton. Lay testimony regarding a claimant's symptoms of how an impairment affects the claimant's ability to work is competent evidence that an ALJ must take into account. <u>Molina</u>, 674 F.3d at 1114 (citation omitted). The ALJ must provide "reasons germane to each witness" in order to reject such testimony. <u>Id.</u> (citation and internal quotation omitted).

Ms. Sutton's written testimony stated that Burns's headache pain was a 5.5 or six out of ten, twenty-four hours a day, and that a variety of physical and mental activities such as personal hygiene, cooking, bending, concentrating, and most postural movement or physical exertion caused his headaches to rise to eight or ten out of ten. Tr. 214–16. She also testified to his limited social interactions, inability to do chores, trouble sleeping, and short-term memory problems. Tr. 218–20.

The ALJ gave "little weight" to Ms. Sutton's pre-2011 testimony because "[t]he medical evidence does not support the allegation that nearly any mental or physical exertion caused the claimant's pain to reach ten of ten." Tr. 579–80. "[I]nconsistency with or lack of corroboration by the medical record is [alone] a germane reason to discredit third-party statements." <u>Brown v. Colvin</u>, No. 3:13-CV-01832-HZ, 2014 WL 6388540, at *7 (D. Or. Nov. 13, 2014) (citing <u>Griffith v. Colvin</u>, 2014 WL 1303102, *3 (D. Or. Mar. 30, 2014); <u>see also</u> <u>Lewis v. Apfel</u>, 236 F.3d 503, 511 (9th Cir. 2001) ("[o]ne reason for which an ALJ may discount lay testimony is that it conflicts with medical evidence"). As explained above, there is evidence that during visits with physicians, Burns moved "without difficulty" and with "no sign of fatigue," despite engaging in various range of motion, gain, and reflex tests. Tr. 333–34. Moreover, none of the consulting

physicians noted any increase in Burns's headache pain despite subjecting him to an array of mental assessments. E.g., Tr. 379–81. These reports conflict with Ms. Sutton's testimony that suggest nearly any physical or mental exertion, such as "shaving" or "concentrating," would cause Burns's headaches to reach, at times, the highest level of pain that a human can experience, i.e. a "ten-plus" out of ten. Tr. 221.

Although the ALJ did not specifically refer to these findings in discounting Ms. Sutton's testimony, his reasoning is supported by substantial evidence which the ALJ thoroughly explained throughout his decision. Therefore, the ALJ did not err in failing to fully credit Ms. Sutton's testimony. Lewis, 236 F.3d at 512 (upholding ALJ's finding regarding lay witness testimony as supported by substantial evidence even though the ALJ "did not clearly link his determination to those reasons."); Glover v. Astrue, 835 F. Supp. 2d 1003, 1014 (D. Or. 2011) (affirming ALJ's discounting of lay testimony because it was "inconsistent with . . . and not fully supported by the medical record" despite the ALJ's failure to specifically reference the conflicting evidence). Given this legally sufficient reason for discounting Ms. Sutton's testimony, any other error Burns attributes to the ALJ's treatment of her pre-2011 testimony is harmless. See Carmickle, 533 F.3d at 1162 (explaining that an error in one reason for discounting credibility is harmless error where ALJ's "remaining reasoning and ultimate credibility determination were adequately supported by substantial evidence in the record.")

**4. Pre-2011 Step Five Finding**

At step five, the ALJ found that, prior to January 1, 2011, Burns would have been able to work as a room cleaner, laundry worker, and small product assembler. Tr. 581. Burns argues that the ALJ's hypothetical question posed to the vocational expert did not set out all of his restrictions, because it did not include Burns's "credible allegations, those of the lay witness, and

the limitations described by Dr. Goslin." Pl. Brief at 20. He also asserts that two of the three

jobs, laundry worker and small products assembler, "are inconsistent with the ALJ's own RFC

finding," which limited Burns "to work involving one- to two-step commands but not more

detailed tasks." Pl. Brief at 20.

The ALJ's finding at step five was not in error. The ALJ's hypothetical to the vocational

expert was "proper because it included all of the functional limitations the ALJ found were

supported by substantial evidence." Gray v. Comm'r of Soc. Sec. Admin., 365 F. App'x 60, 63

(9th Cir. 2010); Stubbs-Danielson v. Astrue, 539 F.3d 1169, 1175–76 (9th Cir. 2008) (rejecting

argument that ALJ's hypothetical was incomplete because it failed to include limitations the ALJ

properly found were not supported by substantial evidence). As explained above, the ALJ did not

err in discounting Burn's credibility, the lay witness testimony, and Dr. Goslin's opinions.

Therefore, his hypothetical to the vocational expert did not have to account for those claimed

limitations.

Secondly, even if the two jobs Burns identifies as problematic were removed, Burns fails

to demonstrate that the remaining job, room cleaner, with 1,000 jobs in Oregon and 100,000

nationwide, would not satisfy the ALJ's burden at step five. Gray, 365 F. App'x at 63 (finding

that vocational expert's testimony that 980 jobs in Oregon and 59,000 national jobs constituted a

"significant number of jobs" sufficient to find claimant not disabled) (citing Meanel v. Apfel,

172 F.3d 1111, 1115 (9th Cir. 1999) (between 1,000 and 1,500 jobs in local area is a "significant

number"); Barker v. Sec'y of HHS, 882 F.2d 1474, 1478–79 (9th Cir. 1989) (1,266 jobs in local

economy is a "significant number")). Burns does not dispute the ALJ's finding that he could

have worked as a room cleaner before 2011. Since that job exists in significant numbers, the ALJ

correctly found that Burns was not disabled within the meaning of the Social Security Act.

17 - OPINION & ORDER

### 5.  January 1, 2011 Onset Date

Finally, Burns contends that the ALJ erred in finding that he became disabled on January 1, 2011. His argument essentially mirrors others made throughout his brief, specifically that the ALJ erroneously discounted Dr. Goslin's opinions, gave too much weight to the opinion of nonexamining medical expert Dr. McDevitt, and improperly discounted Burns's own testimony and lay testimony from his mother. As explained above, the ALJ's weighing of the medical evidence, Burns's credibility, and Ms. Sutton's testimony are supported by legally sufficient reasoning.

Burns also argues generally that the January 1, 2011 onset date is not supported by substantial evidence. Pl. Reply at 2. The Court disagrees. The ALJ fully explained the relevant medical evidence, found that Burns's condition worsened after he stopped rehabilitation in late 2010, and concluded that Burns subsequently became disabled. Tr. 582–84. Burns essentially disagrees with the ALJ's weighing of the medical evidence and asks the Court to adopt his interpretation of the record. While the evidence may be amenable to more than one rational interpretation, the Court cannot substitute its own judgment for that of the Commissioner. Parra v. Astrue, 481 F.3d 742, 746 (9th Cir. 2007); see also Andrews, 53 F.3d at 1039–40 (explaining that the court must uphold the ALJ's decision "where the evidence is susceptible to more than one rational interpretation.") (citation omitted). The ALJ correctly applied the law and supported his findings with substantial evidence and sufficient reasoning. Accordingly, the Court must uphold the ALJ's decision. Tommasetti, 533 F.3d at 1038 (citing Batson, 359 F.3d at 1193) (additional citation omitted)).

After finding that before 2011, Burns could work as a room cleaner, among others, the ALJ found that "[t]he evidence supports finding greater limitations as of January 1, 2011." Tr.

582. In support of his conclusion, the ALJ explained in detail Burns's visits with Dr. Stuckey and Dr. Ogisu in 2012; Dr. Ogisu previously examined Burns in 2007, and Dr. Stuckey previously examined him in 2008. Tr. 332–35; 377–81.

The ALJ explained that Dr. Stuckey's reports showed Burns's memory scores had fallen from average or low average in 2008 to low average or deficient in 2012. Tr. 582. Dr. Stuckey noted that Burns struggled with arithmetic, and found that Burns had marked limitations in handling simple instructions, using judgment, interacting with the public, and dealing with work situations. Tr. 1048–49. The ALJ gave Dr. Stuckey's opinion "significant weight" because it was "based on objective testing and a thorough examination." Tr. 582.

Dr. Ogisu's report noted that Burns had "significant cognitive impairment," that many of his responses to Dr. Ogisu's questions "missed the mark," that he struggled with concentration, and that Burns likely "lack[ed] full insight into his own deficits." Tr. 1056. Dr. Ogisu also performed a physical examination, and found that Burns moved around without much difficulty, had a full range of motion, mostly 5/5 strength, good dexterity, and no problems reaching, bending, or walking. Tr. 1055. Dr. Ogisu specifically noted that Burns's "performance during the exam [was] not impeded by pain." Tr. 1054.

Dr. Ogisu limited Burns to lifting twenty pounds continuously, fifty occasionally, and a hundred pounds minimally. Dr. Ogisu did not state any limits on sitting or standing, but did limit Burns to walking for one hour and six out of eight totally because of some dizziness and his headaches. Tr. 1057–58. The ALJ gave Dr. Ogisu's opinion some weight—he found that the doctor's prescribed "sitting, standing, walking limits" were consistent with Burns's post-2011 RFC, but that other evidence supported greater limits on lifting." Tr. 582–83.

At the 2013 hearing, the ALJ noted that Burns's visits with doctors in 2012 suggested that his symptoms had become more severe since 2008. Tr. 619. He relied on Dr. McDevitt's expertise in traumatic brain injuries to help explain the doctors reports, the memory scores, the decline in Burn's condition, and to provide background information about traumatic brain injury. See Tr. 618–21, 625–26. Of particular importance was Dr. McDevitt's testimony that Burn's "function had decreased" because he "had not undergone consistent cognitive rehabilitation and physical therapy." Tr. 582.

As mentioned above, the ALJ gave limited weight to a 2013 questionnaire from Dr. Goslin because there were no treatment records from her office after 2010. Tr. 583. He analyzed new written testimony Ms. Sutton submitted in February of 2011 and found the limitations described therein were consistent with the decline in Burns's condition. Tr. 583.

The ALJ considered all this evidence and concluded that in 2011, after Burns had stopped rehabilitation and therapy in late 2010, his functioning had decreased to the point of disability. Tr. 582–83. The Court finds that this conclusion is supported by substantial evidence in the record and legally sufficient reasoning, and thus the ALJ's decision must be upheld. Tommasetti, 533 F.3d at 1038 (citing Batson, 359 F.3d at 1193) (additional citation omitted)).

## CONCLUSION

For the reasons stated, the Commissioner's decision is AFFIRMED.

IT IS SO ORDERED.

Dated this _____ 10 _____ day of _____ July _____, 2015.

_Marco Hernandez_

MARCO A. HERNÁNDEZ
United States District Judge